# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 10-02059-TBB-11** |
| **AIG BAKER DEPTFORD, L.L.C.** | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MOTION FOR ORDER PURSUANT TO SECTIONS 105(a), 361, 363, 541, AND 542 OF THE BANKRUPTCY CODE (I) DETERMINING THAT RENTS GENERATED FROM THE DEBTOR'S PROPERTY CONSTITUTE CASH COLLATERAL, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL IN THE ORDINARY COURSE OF BUSINESS, (III) IF NECESSARY, GRANTING ALTERNATIVE RELIEF, AND (IV) SCHEDULING A FINAL HEARING

**COMES NOW** AIG Baker Deptford, L.L.C., as debtor and debtor-in-possession (the "Debtor"), and hereby submits this Motion (the "Motion"), pursuant to sections 105(a), 361, 363, 541, and 542 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), for an Order (i) Determining that the Rents Generated From the Debtor's Property Constitute Cash Collateral, (ii) Authorizing the Debtor to Use Cash Collateral in the Ordinary Course of Business, (iii) if Necessary, Granting Alternative Relief, and (iv) Scheduling a Final Hearing. In support of this Motion, the Debtor respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      As discussed in more detail in the Declaration of Ronald R. Day in Support of Chapter 11 Petition and First-Day Motions and Applications, filed contemporaneously herewith, the Debtor operates as part of an integrated business enterprise with centralized property management. The Debtor is solely owned by AIG Baker Shopping Center Properties, L.L.C.

("SCP"), and the Debtor's property is managed by SCP's internal management company, AIG Baker Management, L.L.C. ("SCP Management").

2.      The operation and maintenance of the Debtor's business is supported solely by the collection of rents from tenants at its property.  These rents constitute cash collateral.  Without the use of the rents, the Debtor will be unable to continue to operate and maintain its property during the course of this chapter 11 case, which will cause substantial and irreparable harm to the Debtor's estate, its creditors, and the Debtor's ability to continue its business as a going concern.

3.      Accordingly, for the reasons stated herein, the Debtor requests the entry of an order determining that the rents constitute cash collateral and authorizing the Debtor to use the cash collateral in the ordinary course of business.

### Bankruptcy Rule 4001 Statement

4.      In accordance with Bankruptcy Rule 4001(b), below is a summary of the Debtor's request for and terms of the proposed use of Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code):

a.    Parties with an Interest in Cash Collateral: PNC (as defined herein) and Regions Bank ("Regions") hold an interest in the Cash Collateral.

b.    Use of Cash Collateral: The Debtor proposes to use Cash Collateral to, among other things, pay certain operating expenses with respect to the Property (as defined herein), to maintain the Debtor's business operations, to pay the monthly payroll allocation reimbursement and management fee to SCP Management, to pay the costs and expenses of administering the Debtor's estate, and to make monthly payments under the Loan Documents (as defined herein).

c.    Duration of the Use of Cash Collateral: The Debtor proposes to use Cash Collateral during the pendency of its chapter 11 case.

d.    Adequate Protection: (i) Both PNC and Regions are oversecured and the equity cushion in the Property is sufficient to adequately protect PNC's and Regions' interest; and (ii) the Debtor will continue to use the Cash Collateral to operate and maintain the Property, which constitutes adequate protection with respect to both PNC and Regions.

2

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

6.      On April 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to operate its businesses as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      As of the date of this Motion, no official committee of unsecured creditors has been appointed in this chapter 11 case.

### A.      Company Background

8.      The Debtor owns a certain shopping center located in Deptford, New Jersey, commonly known as "Deptford Landing" ("Deptford" or the "Property").  Tenants at Deptford include such well-known entities as Wal-Mart, Sam's Wholesale Club, Michaels' Arts and Crafts, and PetSmart.  The Debtor currently has lease agreements with 17 tenants, occupying over 95% of the available total square footage at Deptford.

9.      The Debtor is solely owned by AIG Baker Shopping Center Properties, L.L.C. ("SCP").  SCP's parent company is AIG Baker Partnership, which is a joint venture between AIG Baker, LLC and Alex Baker Limited Partnership.

10.     The Debtor is headquartered in and operates out of Birmingham, Alabama.

11.     SCP is in the business of buying and developing shopping centers and other mixed-use developments.  SCP currently owns fifteen (15) shopping centers and thirty-five (35) total developments located around the country and in various stages of development.

3

12. Deptford is managed by SCP's internal management company, AIG Baker Management, LLC ("SCP Management"). SCP Management also manages the other developments currently owned by SCP.

13. SCP Management employs and/or contracts with the individuals who manage and maintain Deptford. The Debtor has no employees of its own. The Debtor contributes to SCP Management's employees' wages through a property payroll allocation reimbursement and a monthly management fee, which is paid by the Debtor to SCP Management and is based on a certain percentage of the rents collected from Deptford's tenants. The Debtor pays a market rate of approximately five percent (5%) of its collected rents to SCP Management as a management fee.

**B. Debt Structure**

14. In 2006, the Debtor purchased certain land and, over the next few years, developed the Deptford shopping center.

15. To finance this transaction, the Debtor entered into that certain Construction Loan Agreement, dated as of November 14, 2006 (the "2006 Loan Agreement"), with PNC Bank, National Association ("PNC"), as agent, and certain additional banks (collectively, the "Pre-Petition Lenders"), pursuant to which the Pre-Petition Lenders agreed to make a loan to the Debtor in the original principal amount of $38,867,862. The Debtor's obligations under the 2006 Loan Agreement are evidenced by: (i) that certain Mortgage Note, dated as of November 14, 2006, executed by the Debtor in favor of PNC in the original principal amount of $23,867,862 (the "2006 PNC Note"); and (ii) that certain Mortgage Note, dated as of November 14, 2006, executed by the Debtor in favor of Regions Bank ("Regions") in the original principal

4

amount of $15,000,000 (the "2006 Regions Note" and, together with the 2006 Loan Agreement and the 2006 PNC Note, the "2006 Construction Loan Documents").

16.     Subsequently, the Debtor, PNC, as agent, and the Pre-Petition Lenders entered into that certain Construction Loan Agreement, dated as of August 13, 2008 (the "2008 Loan Agreement"), pursuant to which the Pre-Petition Lenders agreed to make an additional loan to the Debtor in the original principal amount of $2,001,094. The Debtor's obligations under the 2008 Loan Agreement are evidenced by: (i) that certain Mortgage Note, dated as of August 13, 2008, executed by the Debtor in favor of PNC in the original principal amount of $1,228,831.80 (the "2008 PNC Note"); and (ii) that certain Mortgage Note, dated as of August 13, 2008, executed by the Debtor in favor of Regions in the original principal amount of $772,262.20 (the "2008 Regions Note" and, together with the 2008 Loan Agreement and the 2008 PNC Note, the "2008 Construction Loan Documents"). The obligations of the Debtor to the Pre-Petition Lenders under the 2006 Construction Loan Documents and the 2008 Construction Loan Documents are referred to herein as the "Obligations."

17.     The Debtor's obligations to the Pre-Petition Lenders under the 2006 Construction Loan Documents are secured by a lien on substantially all of the real and personal property of the Debtor, as set forth in that certain Mortgage and Security Agreement, dated as of November 14, 2006 (the "2006 Security Agreement"). The Debtor's obligations to the Pre-Petition Lenders under the 2008 Construction Loan Documents are secured by a lien on substantially all of the real and personal property of the Debtor, as set forth in that certain Mortgage and Security Agreement, dated as of August 13, 2008 (the "2008 Security Agreement"), and Assignment of Rents, Leases and Profits, dated as of August 13, 2008 (the "Assignment of Rents," and together

Case 10-02059-TBB11   Doc 8   Filed 04/01/10   Entered 04/01/10 16:36:37   Desc Main
Document      Page 5 of 28

with the 2006 Security Agreement, the 2008 Security Agreement, the 2006 Construction Loan Documents, and the 2008 Construction Loan Documents, the "Loan Documents").

18.     The 2006 Construction Loan Documents and the 2008 Construction Loan Documents require the Debtor to make certain monthly payments to the Pre-Petition Lenders, which are to be applied to interest and principal in accordance therein. The Debtor uses the Rents to make its monthly loan payments. Upon information and belief, as of the Petition Date, the aggregate principal amount outstanding under the 2006 Loan Agreement and the 2008 Loan Agreement is approximately $40,391,376. The value of the Property exceeds the amount of the Obligations.

C.      **The Cash Management Procedures**

19.     The Debtor and certain of its nondebtor affiliates utilize a centralized cash management system (the "Cash Management System") to, among other things, collect and transfer the funds generated by the Debtor and disburse those funds to satisfy the obligations required to operate and maintain the Debtor's business. The Cash Management System has been utilized successfully by Deptford and the other SCP properties for over sixteen years.

20.     The only source of income the Debtor generates is the rents collected each month under the tenant lease agreements. Rents are paid by either check or wire transfer and are deposited or wired into a master account (the "Master Account"), which is maintained in the name of SCP Management at RBC Bank. Rents collected with respect to other SCP-owned LLCs are also deposited into this Master Account.

21.     Although the Debtor does not maintain its own bank account, the Master Account is comprised of several distinct "sub-accounts" that permit SCP Management to properly account for, trace, and allocate the rents and expenditures for each of the SCP-owned LLCs, including the

6

Debtor. Therefore, the rents collected for Deptford are separately tracked and accounted such that only the rents collected by the Debtor and deposited into this Master Account are disbursed by SCP Management towards the payment of operating expenses and other costs incurred with respect to Deptford, including payments to outside service providers and the management fees.

      **D.**      **<u>Events Leading to the Debtor's Chapter 11 Case</u>**

22.      The monthly rents collected by the Debtor from the tenants at Deptford are the Debtor's only source of revenue. The Debtor, through the Cash Management System, historically has used these rents to pay, among other things, debt service and other costs and expenses with respect to the operation and maintenance of Deptford.

23.      In February 2009, the Debtor failed to make a scheduled interest payment due to the Pre-Petition Lenders. Shortly thereafter, PNC sent a letter to the Debtor's tenants directing them to pay rent directly to PNC instead of to the Debtor (the "<u>Rent Letter</u>"). PNC also sent letters to the Debtor demanding that any rents the Debtor received be turned over to PNC (collectively, the "<u>Turnover Letters</u>").

24.      The Debtor offered to pay the missed interest payment in full so as to restore PNC to its prior economic condition, but PNC refused to accept the payment. Further, PNC stopped providing funding for certain construction costs, and the Debtor had to cover these costs in order to meet the provisions of certain tenant leases.

25.      With no other recourse, the Debtor was forced to enter into a short-term forbearance agreement with PNC. Meanwhile, PNC consistently represented that if the short-term forbearance conditions were met, PNC would engage in good faith negotiations regarding a longer term restructuring. The Debtor met all conditions of the forbearance. But at its expiration, PNC still refused to engage in negotiations regarding a longer term restructuring of

the Obligations. In fact, PNC insisted on full payment, knowing full well that the Debtor could no longer use the rents to make such payment.

26.     As a result of the Rent Letter and the Turnover Letters, PNC has been in direct receipt of the tenants' monthly rental payments, which has caused disruption. Since PNC took over the collection of rents, Deptford's management has had to rely on PNC to pay the Deptford bills. On multiple occasions, PNC has disputed the need for services, and Deptford's management has struggled to get PNC to pay certain bills. If this continues, PNC could cause significant harm to Deptford and its tenants.

27.     Further, PNC refused to pay the broker fee on a new lease. Although Deptford's occupancy is high, tenants can lose business and have to be replaced, at any time. Retail space that remains empty can hurt surrounding businesses, in a domino effect. PNC's actions jeopardize Deptford's relationship with its brokers and thus its ability to maintain favorable occupancy rates. The Debtor also is concerned that PNC will refuse to fund tenant improvements that often are required to accommodate a new tenant's business.

28.     Over the past months, while PNC has controlled the rents, the Property has declined in value. Continued disruption in the operation and maintenance - including the lease up - of the Property will cause Deptford's tenants to continue to suffer and will cause further deterioration in the value of the Property. Further, PNC has refused to apply the rents to service the various debt obligations in violation of the Loan Documents. Thus, the Debtor seeks relief through the filing of this chapter 11 case to, among other things, use Cash Collateral to provide for the payment of the costs and expenses necessary for the continued operation and maintenance of the Property.

## RELIEF REQUESTED

29.     Pursuant to this Motion, the Debtor seeks entry of an order, pursuant to sections 105(a), 361, 363, 541, and 542 of the Bankruptcy Code, (i) determining that the rents generated from the Property constitute Cash Collateral, (ii) authorizing the Debtor to use the Cash Collateral in the ordinary course of its business during the pendency of this chapter 11 case, (iii) if necessary, granting alternative relief, and (iv) scheduling a final hearing.

## BASIS FOR RELIEF REQUESTED

### A.     The Rents Constitute Cash Collateral.

30.     The rents generated from Deptford are property of the estate, as such term is defined in section 541 of the Bankruptcy Code. 11 U.S.C. § 541 (defining property of the estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case."). The Debtor possesses the right to collect, use and enjoy the rental income generated by the Property, subject only to the security interest of the Pre-Petition Lenders. Accordingly, the rent must be paid directly to the Debtor, as debtor-in-possession, during the pendency of this chapter 11 case. 11 U.S.C. § 542(b) (noting that an entity that owes a debt that is property of the estate shall pay such debt to the debtor).

31.     To the extent that any Pre-Petition Lender has collected any rents paid to it by any tenant of Deptford which as of the Petition Date have not been applied to reduce the Obligations, such rents must be turned over to the Debtor pursuant to section 542(a) of the Bankruptcy Code.[1] 11 U.S.C. § 542(a) (providing that any entity in possession of property of the estate must deliver to the debtor such property or the value of such property); *see also United States v. Whiting*

---

[1]     Arguably, any amounts paid to PNC by tenants of Deptford pursuant to the lease agreements for common area maintenance, insurance, taxes, and other similar uses do not constitute "rents" within the meaning of the Loan Documents and, therefore, must be turned over to the Debtor to be applied for the appropriate purposes.

9

*Pools, Inc.*, 462 U.S. 198, 204 & nn. 8, 9 (1983) (ordering turn over of debtor's property that was seized by a secured creditor prior to the petition date, and noting that estate property includes assets in which the debtor has a nonpossessory interest).

**1.     Rents Which Are Derived From Real Property Owned By A Debtor Constitute Property of the Estate Under Section 541(a)(6) Without Regard to the Nature of a Lender's Interest In Such Rents.**

32.     Regardless of whether the Assignment of Rents was absolute or a collateral assignment, all rents generated by the Property constitute Cash Collateral pursuant to section 541(a)(6) of the Bankruptcy Code.     Section 541(a)(6) provides, in relevant part, that the bankruptcy estate "is comprised of all of the following property, wherever located and by whomever held: . . . (6) Proceeds, product, offspring, **rents**, or profits of or from property of the estate . . . ." 11 U.S.C. § 541(a)(6) (emphasis added).

33.     There is no doubt or dispute that the Property, which is owned by the Debtor, is property of the estate.     There is also no doubt or dispute that the rents are generated from the Property.     Therefore, under the clear and unambiguous language of section 541(a)(6) of the Bankruptcy Code, all rents generated from the Property, whether prepetition or postpetition, must constitute property of the estate. *See In re Amaravathi Ltd. P'ship*, 416 B.R. 618, 623–24 (Bankr. S.D. Tex. 2009) (holding that, under the unambiguous language of section 541(a)(6), all rents generated from property of the estate also constitute property of the estate, regardless of whether an assignment of rents purports to be absolute); *In re Bryant Manor, LLC*, 422 B.R. 278, 288–89 (Bankr. D. Kan. 2010) (same).     Any other outcome would "turn one of the chief purposes of chapter 11 on its head" and would "exemplif[y] the definition of absurd." *In re Amaravathi*, 416 B.R. at 625–27 (noting that if rents were not property of the estate, the debtor

would have no incentive to generate income; also noting the intent of section 541(a)(6) to override any state law to the contrary).

34.    The Supreme Court has held that bankruptcy courts should generally look to state law to determine property rights in the assets of a bankruptcy estate. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed. 2d 136 (1979). At issue in *Butner* was whether a mortgage lender or the bankruptcy trustee was entitled to post-petition rents generated by rental property. *Id.* at 52-52, 99 S.Ct. 914. The Supreme Court held that property rights in post-petition rents are determined by looking to state law. *Id.* In so doing, however, they made clear that federal bankruptcy law would override state law if Congress were to enact a statute defining the rights to postpetition rents:

> The Constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankruptcy estate. But Congress has not chosen to exercise its power to fashion any such rule.

*Id.* at 54, 99 S.Ct. 914.

35.    Significantly, *Butner* was decided on February 21, 1979 under the Bankruptcy Act of 1898 and prior to the enactment of the Bankruptcy Code.    *Id.* at 48, 99 S. Ct. 914. Unlike the Bankruptcy Act, which dictated the holding in *Butner*, the Bankruptcy Code does unambiguously define "interests in the rents and profits earned by property in a bankruptcy estate." *Id.* at 54, 99 S.Ct. 914; *Amaravathi Ltd. P'ship*, 416 B.R. at 623–24. It does so unambiguously in section 541(a)(6): "The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held: . . . (6) Proceeds, products, offspring, **rents**, or profits **of or from property of the estate** . . . ." 11 U.S.C. §541(a)(6) (emphasis added).

36.     Courts must follow unambiguous statutory text unless doing so leads to absurd results. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."). As the court in *Amaravathi* concluded, there is nothing absurd about section 541(a)(6)'s inclusion of post-petition rents in the bankruptcy estate. 416 B.R. at 624. Indeed, a review of the relevant sections of the Bankruptcy Code demonstrates that Congress created a wholly rational structure for resolving disputes involving post-petition rents:

- Section 541(a)(6) makes post-petition rents property of the estate;

- Section 552(b) extends a lender's pre-petition collateral interest in rents to rents that are collected post-petition; and

- Section 363 mandates that a trustee or debtor-in-possession provide adequate protection before the rents can be utilized by the estate.

*Id.* The carefully crafted statutory framework promotes the salutary goal of allowing an estate to maintain its assets, which enhances the likelihood of a successful reorganization. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate."). It also serves the interest of mortgage lenders like PNC by preserving and protecting the lender's interest in the rents. *Amaravathi Ltd. P'ship*, 416 B.R. at 624.

37.     There is no colorable argument that the foregoing statutory framework set out by Congress leads to an absurd or impractical result. *Id.* As a result, this Court should follow the clear mandate of section 541(a)(6) and determine that the Property is property of the Debtor's

Case 10-02059-TBB11   Doc 8   Filed 04/01/10   Entered 04/01/10 16:36:37   Desc Main
Document      Page 12 of 28

estate and therefore the rents derived from such Property also constitute property of the estate and cash collateral of the Pre-Petition Lenders.

    **2.**    **The Availability of Rents To Be Used By a Debtor In a Bankruptcy Case As a Matter of Federal Law Was Affirmed By the 2005 Amendments To The Bankruptcy Code.**

    38.    In 2005, Congress amended the single asset real estate provisions of the Bankruptcy Code -- which are applicable to the Debtor -- in a number of respects. Importantly, section 362(d)(3) of the Bankruptcy Code was amended to provide that monthly interest payments to the lender required by section 362(d)(3)(B) "may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property . . . ." 11 U.S.C. § 362(d)(3)(B)(i). The statute is plain on its face: rents are permitted to be used by the Debtor to make the monthly payments without satisfying the conditions attendant to the use of cash collateral set forth in section 363(c)(2). The statutory change is consistent with section 541(a)(6), which includes the rents of the Property (which is property of the estate) within the bankruptcy estate notwithstanding the character of the lender's interests in such rents under state law and constitutes further express recognition by Congress that the issue of whether and to what extent the rents can be used by the debtor property owner is a matter of federal and not state law.

    **3.**    **Even If State Law Governs, Rents from the Debtor's Property Are Property Of the Estate Because They Were Assigned As Security To The Pre-Petition Lenders And Not Absolutely Conveyed.**

    39.    Section 541(a)(1) provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate. 11 U.S.C. §541(a)(1). Therefore, to the extent that 541(a)(6) does not control, the issue is whether the Debtor had any legal or equitable interest in rents from Deptford as of the date of the Petition

Date. PNC has asserted that by executing the Loan Documents, PNC became the sole and absolute owner of the rents. It makes that assertion notwithstanding the fact that its books and records and the books of records of the Debtor, which it never challenged, have always reflected the Debtor as the owner of the rents.

40.     In fact, the assignment of the rents by the Debtor to PNC was intended only to secure the Obligations owed by the Debtor to the Pre-Petition Lenders. That intent is evident from both the express provisions of the applicable Loan Documents and from the conduct of the parties.

41.     Alabama and New Jersey law are clear that where the applicable instrument contains language indicating that the assignment of rents was intended to be a security interest, such agreement will be treated by the court as a security interest and the rents will constitute cash collateral. In *In re Turtle Creek, Ltd.*, 194 B.R. 267 (Bankr. N.D. Ala. 1996), the assignment of rents at issue provided that it was given "for the purpose of securing the prompt payment of the indebtedness . . ." and that it was given "for the purpose of discharging the debt hereby secured." *Id.* at 278–80. The court found that the agreement evidenced an intent to create a security interest in the rents and, therefore, the rents were determined to be property of the estate. *Id.; see also Gulf Life Ins. Co. v. Wal-Mart Stores*, 972 F. Supp. 575, 588 (M.D. Ala. 1997) (finding rents to be property of the estate where assignment agreement evidenced an intent to create a security interest); *First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 427 (3d Cir. 1995) (noting that, under New Jersey law, the court must look at the language of the instrument to determine whether it demonstrates an intent to be an absolute assignment or to create a security interest); *In re Mocco*, 176 B.R. 335 (Bankr. D.N.J. 1995)

(holding that the agreement in question was a pledge of rents and not an absolute assignment, and therefore the rents were cash collateral of the debtor's estate).

42.     Courts generally hold that an assignment of rents grants a security interest only, even where it contains language providing that the assignment of rents is absolute. *See In re Guardian Realty Group, LLC*, 205 B.R. 1, 4–5 (Bankr. D.D.C. 1997) (noting that even though an assignment of rights may purport to grant an assignee an absolute right to rents, the true nature of the assignee's interest is no more than a security interest; holding that rents are property of the estate where an assignment in substance creates a security interest); *see also In re Bethesda Air Rights Ltd. P'ship*, 117 B.R. 202, 208 (Bankr. D. Md. 1990) (finding assignment of rents was not an absolute assignment, but rather a security interest, despite language providing that the assignment was intended to be an absolute assignment and not merely the passing of a security interest); *In re Allen*, 357 B.R. 103, 111–13 (Bankr. S.D. Tex. 2006) (concluding that an assignment of rents did not constitute an absolute assignment, despite language providing that "This assignment of rents constitutes an absolute assignment and not an assignment for additional security."); *In re McCann*, 140 B.R. 926 (Bankr. D. Mass. 1992) (finding an assignment to be merely a conditional pledge of rents despite unambiguous language in the instrument providing that the assignment of rents constitutes an absolute assignment and not an assignment for additional security only).

43.     Each of the 2006 Security Agreement, 2008 Security Agreement and the Assignment of Rents grants in favor of the Pre-Petition Lenders a security interest in the rents and leases from the Property. Although each of the granting documents contains language to the effect that the assignment is absolute and not intended merely to grant a security interest, the

Case 10-02059-TBB11    Doc 8    Filed 04/01/10    Entered 04/01/10 16:36:37    Desc Main
Document    Page 15 of 28

documents when considered as a whole clearly indicate the intent of the parties that the grant was in fact intended as security. Specifically,

- Each of the 2006 Security Agreement and the 2008 Security Agreement expressly provides that "the Mortgagee shall have a **security interest** in the following described property . . . (d) All rents, issues and profits arising or issuing from the Land and the Improvements . . . ." *See* 2006 Security Agreement pp. 2-3; 2008 Security Agreement pp. 2-3 (emphasis added).

- The Assignment Agreement expressly provides that the assignment was **intended as "security for the payment** of the [indebtedness] and the observance and performance of all the terms, covenants and provisions of the Loan Documents, the Mortgage and this Assignment . . . ." *See* Assignment Agreement pp. 1 & 3 (emphasis added).

- Each of the 2006 Security Agreement and the 2008 Security Agreement clearly states that the grant of an interest in the rents to the Pre-Petition Lenders is given for "**the purpose of securing the payment** and performance of the [Obligations]." *See* 2006 Security Agreement p. 1; 2008 Security Agreement p. 1 (emphasis added).

- Each of the 2006 Security Agreement and the 2008 Security Agreement provides that the Debtor "shall not (a) execute an assignment or pledge of the rents [or] the Leases", evidencing the parties acknowledgement that the Debtor was the continuing owner of the rents and leases and had the legal power to effect a subsequent transfer. *See* 2006 Security Agreement p. 5; 2008 Security Agreement p. 5. Similarly, the Assignment Agreement provides that the Debtor "shall not further assign or attempt to assign the Leases or any portion of the rents." *See* Assignment Agreement p. 5.

- Each of the 2006 Security Agreement and the 2008 Security Agreement provides that the Debtor "authorizes and directs each and every present and future tenant of any of the Property to pay all rents directly to the [Pre-Petition Lenders] and to perform all other obligations of that tenant for the direct benefit of the [Pre-Petition Lender], **as if the [Pre-Petition Lender] were the landlord under the Lease.**" *See* 2006 Security Agreement p. 11; 2008 Security Agreement p. 11 (emphasis added). In fact, if the leases had been absolutely and completely conveyed by the Debtor to the Pre-Petition Lenders such that they no longer constitute property of the Debtor's bankruptcy estate, the Pre-Petition Lenders would be the landlord under the leases and a provision that grants them benefits "as if they were such landlord" would have been unnecessary.

- Each of the 2006 Security Agreement and the 2008 Security Agreement contains a provision appointing the Pre-Petition Lenders as "attorney-in-fact for [the Debtor] . . . to do any or all of the following: (a) collect the rents after the occurrence of an Event of Default." *See* 2006 Security Agreement p. 12; 2008 Security Agreement p. 12. This provision reflects the parties' recognition that even after the occurrence of an

16

Event of Default, the Debtor has a property interest in the rents and leases and authorizes the Pre-Petition Lenders to act as the Debtor's attorney in fact with respect to such property interest.

44.    In addition to the express terms of the Loan Documents, the conduct of the Pre-Petition Lenders compels a conclusion that the rents and leases were assigned as security and absolutely conveyed to the Pre-Petition Lenders. First, the Pre-Petition Lenders sought and obtained as part of the financing transaction an insurance policy covering their interest in the rents and leases **as mortgagor** and not as owner. Second, each of the Pre-Petition Lenders is a publicly traded, regulated financial institution and required to produce and report accurate financial statements. After execution and delivery of the Loan Documents, including the Assignment of Rents and the 2006 and 2008 Security Agreements, the Pre-Petition Lenders reflected the ownership of the rents and leases as security for the loans extended by them and not as property owned by them on their audited books and records. Moreover, upon revocation of the Debtor's "license" to collect the rents and leases, the Pre-Petition Lenders did not value the rents and leases and apply the proceeds of the disposition or realization of such property to the Obligations as required by Section 13 of each of the 2006 and 2008 Security Agreements, further evidencing the security nature of their interest in the rents and leases. Finally, there can be no doubt that if the Debtor tendered to the Pre-Petition Lenders an amount equal to the Obligations, that the Pre-Petition Lenders would not contend that they are the owner of the rents. If the Obligations owed to them were paid, they would acknowledge that their interest in the rents would be terminated, further evidencing a collateral and not an absolute assignment.

45.    The rents generated from the Property were not absolutely assigned to the Pre-Petition Lenders and constitute property of the estate pursuant to section 541 of the Bankruptcy Code and, as such, Cash Collateral. *In re Turtle Creek, Ltd.*, 194 B.R. 267 (Bankr. N.D. Ala.

17

1996); *Gulf Life Ins. Co. v. Wal-Mart Stores*, 972 F. Supp. 575 (M.D. Ala. 1997); *In re Cavros*, 262 B.R. 206, 211 (Bankr. D. Conn. 2001) ("When an assignment of rents is intended as security for a debt, the rents constitute [estate property].").

**B.**     <u>Use of Cash Collateral.</u>

46.     The Debtor requires immediate use of the rents generated from Deptford. The rents in this instance consist of the cash on hand, the rents collected by PNC, and any other money collected from tenants, wherever located. In the absence of the use of Cash Collateral, the continued operation of the Debtor's business, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtor and its estate would occur. There is an equity cushion in the Property that will diminish rapidly if the Property is not properly maintained.[2] Consequently, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtor and will enhance the prospects for a successful reorganization of the Debtor under chapter 11 of the Bankruptcy Code.

47.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

48.     It is universally acknowledged that a debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that such life's blood "is available for use, even if to a limited extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interests asserted by affected creditors in such cash are adequately protected. Thus, courts are required to balance

---

[2] The value of the Property has in fact decreased since PNC assumed collection of the rents from tenants at Deptford.

Case 10-02059-TBB11    Doc 8    Filed 04/01/10    Entered 04/01/10 16:36:37    Desc Main
Document    Page 18 of 28

the protection a debtor seeks to provide with the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

49.     Courts have repeatedly recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. *See, e.g., In re Dynaco*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993) (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business."); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *In re Stein*, 19 B.R. at 459 (granting cash collateral motion and declaring that access to cash is imperative for a debtor to operate its business); *In re Constable Plaza Assocs.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (recognizing that the debtor's use of cash collateral to operate and maintain office building would serve to preserve or enhance the value of the building which, in turn, would protect the collateral covered by the lender's mortgage).

50.     In order for the court to authorize the use of cash collateral, it must find the secured creditor is adequately protected. 11 U.S.C. § 363(e). Adequate protection is determined based on the facts and circumstances of each particular case. *In re Pelham Street Assoc.*, 131 B.R. 260, 263 (Bankr. D. R.I. 1991) (recognizing that "adequate protection" under the Code is a "flexible concept, to be tailored to the particular facts of each case."); *In re Karl A. Neise, Inc.*, 16 B.R. 600, 601 (Bankr. S.D. Fla. 1981) (explaining that "[w]hat constitutes adequate protection

Case 10-02059-TBB11   Doc 8   Filed 04/01/10   Entered 04/01/10 16:36:37   Desc Main
                        Document      Page 19 of 28

varies with the facts and circumstances of each particular case."). The principal purpose of adequate protection is to limit a secured creditor's risk that the value of its collateral will decline while being used by the debtor-in-possession. *In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir. 1995) (oversecured creditor only entitled to protection from the decline in value of collateral); *In re Grubbs Constr. Co.*, 319 B.R. 698, 711 (Bankr. M.D. Fla. 2005) (instructing that adequate protection should be "fashioned to compensate for the decline in value of the collateral.").

51.     Importantly, the entitlement to, form of, and amount of adequate protection should be based on a showing that the use of cash collateral will cause the value of a secured creditor's collateral to decrease. *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) ("Despite its form, the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case . . . .").

52.     Courts have held that where a debtor seeks to use rents constituting a secured party's cash collateral, adequate protection is available if the debtor will use the rents for maintaining the property. *See Federal Nat'l Mortgage Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204 (N.D. Ill. 1993) ("[T]he required adequate protection of rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased."); *In re Constable Plaza Assocs.*, 125 B.R. at 105 ("[D]ebtor's plowing back rents solely for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *In re Pritchard Plaza Assocs. Ltd. P'ship*, 84 B.R. 289, 302 (Bankr. D. Mass. 1988) (stating that

adequate protection, if required, would be satisfied if the debtor applied rents to the operation and maintenance of the property); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion).

53.     The standards for authorizing the Debtor to use cash collateral are satisfied in this instance and the adequate protection being offered is sufficient to protect the interest of the secured lenders. There is an equity cushion—albeit a diminishing one—in the Property. The use of the rents during the pendency of this chapter 11 case to pay ongoing expenses for the maintenance and operation of the Property will only preserve or enhance the value of the Property and, as such, will provide adequate protection. Without the immediate ability to use Cash Collateral to provide for the continued operation, maintenance and lease up of the Property, the Debtor will lose tenants, will not be able to procure and add new tenants, and the value of the Property will continue to decline. It is in the best interests of the Debtor's estate and all creditors to allow the Property to continue to operate and to terminate the mismanagement by PNC. Accordingly, the Debtor requests that the Court authorize the Debtor's use of Cash Collateral during the pendency of this chapter 11 case in the manner and for the purposes set forth herein and in the Cash Management Motion.

C.     **In the Alernative, if the Rents Do Not Constitute Cash Collateral, PNC Must Use Rents to Protect the Property and the Debtor's Equity Interest Therein.**

54.     To the extent this Court determines that the rents are not Cash Collateral, the Debtor will be without the means to, and thus unable to, provide for the payment of the costs and expenses necessary for the continued operation, maintenance and lease up of the Property. The equity cushion in the Property is diminishing and will continue to diminish rapidly if the Property is not properly maintained during the pendency of this chapter 11 case. Accordingly, if

Case 10-02059-TBB11     Doc 8     Filed 04/01/10     Entered 04/01/10 16:36:37     Desc Main
Document     Page 21 of 28

PNC continues to receive the rents during this chapter 11 case, it must use such rents, along with any rents it collected prior to the Petition Date, to provide for the payment of all costs and expenses necessary for the operation and maintenance of the Property and the Debtor's business operations, including costs associated with tenant improvements and lease commissions, payment of the monthly management fee and payroll allocation reimbursement to SCP Management, and monthly payments due under the Loan Documents.[3] Given PNC's negligent conduct to date, there is no reason to expect such cooperative action on its part. In addition, PNC should not be permitted to disturb the lease agreements with the current tenants at Deptford, and should cooperate with the Debtor with respect to any and all future leases.[4] Such relief is necessary to, among other things, preserve the value of the Property and ensure a successful reorganization in this chapter 11 case.

**D.      Request for Immediate Interim Relief.**

55.      Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 15 days after service of such motion. Similarly, Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition grant, among other things, a motion to use, sell, or lease property of the debtor's estate." Fed. R. Bankr. P. 6003.

---

[3]    Section 362(d)(3) of the Bankruptcy Code authorizes the use of rents towards monthly debt service payments without the consent of the secured lender and without the need for court approval.

[4]    This appropriate use of the rents can only be assured by requiring that all rents be turned over to SCP Management. Alternatively, if SCP Management is denied turnover, any balance remaining after such payments are made each month should be placed in escrow.

56.     Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

57.     Pursuant to Bankruptcy Rules 4001(b) and 6003, the Debtor requests that the Court conduct an expedited preliminary hearing on the Motion[5] and (i) authorize the Debtor to use the Cash Collateral in the manner and for the purposes set forth herein and in the Cash Management Motion, and (ii) schedule a final hearing to consider the relief requested herein.

58.     Absent authorization from the Court to use Cash Collateral on an interim basis pending a final hearing, the Debtor will be immediately and irreparably harmed. As set forth above, the Debtor's ability to use Cash Collateral is critical to its ability to operate its business and preserve value. Without immediate liquidity provided by the use of Cash Collateral, the Debtor will simply be unable to conduct normal business operations, will be unable to pay basic operating expenses, and will suffer a precipitous loss in value to the detriment of all parties in interest.

59.     Accordingly, the Debtor requests that, pending a final hearing, the Court schedule an interim hearing as soon as practicable to consider the Debtor's request for authorization to use Cash Collateral in the manner and for the purposes set forth herein and in the Cash Management Motion.

60.     For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate.

---

[5]     In accordance with this Court's procedures, the Debtor will file a separate motion for expedited hearing.

## NOTICE AND NO PRIOR REQUEST

61.     Notice of this Motion has been provided to (i) counsel for the Debtor's pre-petition secured lenders, (ii) the United States Bankruptcy Administrator for the Northern District of Alabama, Southern Division, (iii) the Debtor's twenty (20) largest unsecured creditors, (iv) counsel for SCP and (v) all tenants at Deptford. In light of the nature of the relief requested, the Debtor submits that no other or further notice is necessary.

62.     No previous request for the relief sought herein has been made in this bankruptcy case to this or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests this Court enter an order, substantially in the form of Exhibit A attached hereto, (i) determining that rents generated from the Property constitute Cash Collateral, (ii) authorizing the Debtor to use Cash Collateral, including all postpetition rents generated with respect to the Property, in the ordinary course of business, or, in the alternative, directing PNC to use rents to pay all costs and expenses necessary for the continued operation and maintenance of the Property and the Debtor's business operations, including the payment of all management fees, payroll allocation reimbursements, and application to the Debtor's monthly payments due under the Loan Documents; and (iii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated:  April 1, 2010

Respectfully submitted,

**ANDRE M. TOFFEL, P.C.**

Andre M. Toffel
Fourth Floor Farley Building
1929 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 252-7115
Facsimile: (205) 252-0181
atoffel@wwisp.com

*Proposed Counsel for the
Debtor In Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No.  10-02059-TBB-11 |
| AIG BAKER DEPTFORD, L.L.C. | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER ON DEBTOR'S MOTION FOR ORDER PURSUANT TO SECTIONS 105(a), 361, 363, 541 AND 542 OF THE BANKRUPTCY CODE (I) DETERMINING THAT RENTS GENERATED FROM THE DEBTOR'S PROPERTY CONSTITUTE CASH COLLATERAL, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL IN THE ORDINARY COURSE OF BUSINESS, (III) IF NECESSARY, GRANTING ALTERNATIVE RELIEF, AND (IV) SCHEDULING A FINAL HEARING**

This matter came before the Court on the Debtor's Motion for an Order (i) Determining that the Rents Generated From the Debtor's Property Constitute Cash Collateral, (ii) Authorizing the Debtor to Use Cash Collateral in the Ordinary Course of Business, (iii) if Necessary, Granting Alternative Relief, and (iv) Scheduling a Final Hearing (the "Motion"),[6] filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court; the Court having subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this being a core proceeding pursuant to 28 U.S.C. § 157(b); due and proper notice of the Motion having been provided; and the relief requested therein being in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore;

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.  The Motion is GRANTED.

2.  All rents generated from the Property, whether prior to or after the Petition Date, constitute Cash Collateral.

3.  From and after the Petition Date, the Debtor is authorized to collect and have paid directly to it all rents and other amounts due under the Leases from all tenants of Deptford.

4.  Each Pre-Petition Lender is hereby directed to turn over to the Debtor any rents and other amounts paid to such Pre-Petition Lender by any tenant of Deptford that currently is or that may come into such Pre-Petition Lender's possession.

5.  The Debtor is authorized to use Cash Collateral for the purposes set forth in the Motion for the period from the Petition Date through _____, 2010. This authorization includes using Cash Collateral to (i) pay necessary operating expenses with respect to the Property, (ii) maintain the Debtor's business operations, (iii) pay the monthly management fee and payroll allocation reimbursements, (iv) pay the monthly amounts due under the Loan Documents, and (v) pay the costs and expenses of administering the Debtor's estate.

6.  The Debtor shall continue to operate and maintain its business and the Property, which maintenance constitutes adequate protection with respect to the Pre-Petition Lenders.

7.  A final hearing to consider the relief requested in the Motion is scheduled for _____, 2010 at _____ a.m. (Central Time), at which time the Court may authorize the continued use of Cash Collateral.

8.  Notwithstanding anything to the contrary in the Bankruptcy Rules, the terms and conditions of this Order are immediately effective and enforceable upon entry of this Order.

27

9.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

        **SO ORDERED**, this ___ day of _____, 2010.


_____
UNITED STATES BANKRUPTCY COURT JUDGE

Prepared and Presented by:

ANDRE M. TOFFEL, P.C.

_____
Andre M. Toffel
Fourth Floor Farley Building
1929 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 252-7115
Facsimile: (205) 252-0181
atoffel@wwisp.com

*Proposed Counsel for the*
*Debtor In Possession*

Case 10-02059-TBB11   Doc 8   Filed 04/01/10   Entered 04/01/10 16:36:37   Desc Main
Document       Page 28 of 28