# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AIG BAKER DEPTFORD, L.L.C., | ) | |
| | ) | Case No. 10-02059-TBB-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF RONALD R. DAY IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST-DAY MOTIONS AND APPLICATIONS

I, Ronald R. Day, hereby state and declare as follows:

1. I am the Chief Financial Officer ("CFO") of AIG Baker Shopping Center Properties, L.L.C. ("SCP"), the parent company of AIG Baker Deptford, L.L.C. (the "Debtor"). I have been employed in this capacity since July 1999. In this role, I am familiar with the day-to day-operations, business, and financial affairs of the Debtor.

2. I submit this declaration (the "Declaration") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), filed on the date hereof, and the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "First-Day Motions and Applications"). I believe that the relief sought in each of the First-Day Motions and Applications (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtor, and (c) best serves the interests of the Debtor's estate and creditors.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other individuals who manage the

Debtor, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. The facts set forth in this Declaration are personally known to me, and, if called as a witness, I could and would testify thereto. I am authorized to submit this Declaration.

4. On April 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code. This Declaration is intended to provide the background to this case, including an overview of the Debtor's business and the circumstances that compelled the filing of this case, as well as the relevant facts in support of the First-Day Motions and Applications.

## I. BACKGROUND

### A. Company Background

5. The Debtor owns a certain shopping center located in Deptford, New Jersey, commonly known as "Deptford Landing" ("Deptford" or the "Property"). Tenants at Deptford include such well-known entities as Wal-Mart, Sam's Wholesale Club, Michaels' Arts and Crafts, and PetSmart. The Debtor currently has lease agreements with 17 tenants, occupying over 95% of the available total square footage at Deptford.

6. The Debtor is solely owned by AIG Baker Shopping Center Properties, L.L.C. ("SCP"). SCP's parent company is AIG Baker Partnership, which is a joint venture between AIG Baker, LLC and Alex Baker Limited Partnership.

7. The Debtor is headquartered in and operates out of Birmingham, Alabama.

8. SCP is in the business of buying and developing shopping centers and other mixed-use developments. SCP currently owns fifteen (15) shopping centers and thirty-five (35) total developments located around the country and in various stages of development.

9. Deptford is managed by SCP's internal management company, AIG Baker Management, LLC ("SCP Management"). SCP Management also manages the other developments currently owned by SCP.

10. SCP Management employs and/or contracts with the individuals who manage and maintain Deptford. The Debtor has no employees of its own. The Debtor contributes to SCP Management's employees' wages through a property payroll allocation reimbursement and a monthly management fee, which is paid by the Debtor to SCP Management and is based on a certain percentage of the rents collected from Deptford's tenants. The Debtor pays a market rate of approximately five percent (5%) of its collected rents to SCP Management as a management fee.

B. **Debt Structure**

11. In 2006, the Debtor purchased certain land and, over the next few years, developed the Deptford shopping center.

12. To finance this transaction, the Debtor entered into that certain Construction Loan Agreement, dated as of November 14, 2006 (the "2006 Loan Agreement"), with PNC Bank, National Association ("PNC"), as agent, and certain additional banks (collectively, the "Pre-Petition Lenders"), pursuant to which the Pre-Petition Lenders agreed to make a loan to the Debtor in the original principal amount of $38,867,862. The Debtor's obligations under the 2006 Loan Agreement are evidenced by: (i) that certain Mortgage Note, dated as of November 14, 2006, executed by the Debtor in favor of PNC in the original principal amount of $23,867,862 (the "2006 PNC Note"); and (ii) that certain Mortgage Note, dated as of November 14, 2006, executed by the Debtor in favor of Regions Bank ("Regions") in the original principal

amount of $15,000,000 (the "2006 Regions Note" and, together with the 2006 Loan Agreement and the 2006 PNC Note, the "2006 Construction Loan Documents").

13. Subsequently, the Debtor, PNC, as agent, and the Pre-Petition Lenders entered into that certain Construction Loan Agreement, dated as of August 13, 2008 (the "2008 Loan Agreement"), pursuant to which the Pre-Petition Lenders agreed to make an additional loan to the Debtor in the original principal amount of $2,001,094. The Debtor's obligations under the 2008 Loan Agreement are evidenced by: (i) that certain Mortgage Note, dated as of August 13, 2008, executed by the Debtor in favor of PNC in the original principal amount of $1,228,831.80 (the "2008 PNC Note"); and (ii) that certain Mortgage Note, dated as of August 13, 2008, executed by the Debtor in favor of Regions in the original principal amount of $772,262.20 (the "2008 Regions Note" and, together with the 2008 Loan Agreement and the 2008 PNC Note, the "2008 Construction Loan Documents"). The obligations of the Debtor to the Pre-Petition Lenders under the 2006 Construction Loan Documents and the 2008 Construction Loan Documents are referred to herein as the "Obligations."

14. The Debtor's obligations to the Pre-Petition Lenders under the 2006 Construction Loan Documents are secured by a lien on substantially all of the real and personal property of the Debtor, as set forth in that certain Mortgage and Security Agreement, dated as of November 14, 2006 (the "2006 Security Agreement"). The Debtor's obligations to the Pre-Petition Lenders under the 2008 Construction Loan Documents are secured by a lien on substantially all of the real and personal property of the Debtor, as set forth in that certain Mortgage and Security Agreement, dated as of August 13, 2008 (the "2008 Security Agreement"), and Assignment of Rents, Leases and Profits, dated as of August 13, 2008 (the "Assignment of Rents," and together

with the 2006 Security Agreement, the 2008 Security Agreement, the 2006 Construction Loan Documents, and the 2008 Construction Loan Documents, the "Loan Documents").

15. The 2006 Construction Loan Documents and the 2008 Construction Loan Documents require the Debtor to make certain monthly payments to the Pre-Petition Lenders, which are to be applied to interest and principal in accordance therein. The Debtor uses the Rents to make its monthly loan payments. Upon information and belief, as of the Petition Date, the aggregate principal amount outstanding under the 2006 Loan Agreement and the 2008 Loan Agreement is approximately $40,391,376. The value of the Property exceeds the amount of the Obligations.

C. **The Cash Management Procedures**

16. The Debtor and certain of its nondebtor affiliates utilize a centralized cash management system (the "Cash Management System") to, among other things, collect and transfer the funds generated by the Debtor and disburse those funds to satisfy the obligations required to operate and maintain the Debtor's business. The Cash Management System has been utilized successfully by Deptford and the other SCP properties for over sixteen years.

17. The only source of income the Debtor generates is the rents collected each month under the tenant lease agreements. Rents are paid by either check or wire transfer and are deposited or wired into a master account (the "Master Account"), which is maintained in the name of SCP Management at RBC Bank. Rents collected with respect to other SCP-owned LLCs are also deposited into this Master Account.

18. Although the Debtor does not maintain its own bank account, the Master Account is comprised of several distinct "sub-accounts" that permit SCP Management to properly account for, trace, and allocate the rents and expenditures for each of the SCP-owned LLCs,

including the Debtor. Therefore, the rents collected for Deptford are separately tracked and accounted such that only the rents collected by the Debtor and deposited into this Master Account are disbursed by SCP Management towards the payment of operating expenses and other costs incurred with respect to Deptford, including payments to outside service providers and the management fees.

### D. Events Leading to the Debtor's Chapter 11 Case

19. The monthly rents collected by the Debtor from the tenants at Deptford are the Debtor's only source of revenue. The Debtor, through the Cash Management System, historically has used these rents to pay, among other things, debt service and other costs and expenses with respect to the operation and maintenance of Deptford.

20. In February 2009, the Debtor failed to make a scheduled interest payment due to the Pre-Petition Lenders. Shortly thereafter, PNC sent a letter to the Debtor's tenants directing them to pay rent directly to PNC instead of to the Debtor (the "Rent Letter"). PNC also sent letters to the Debtor demanding that any rents the Debtor received be turned over to PNC (collectively, the "Turnover Letters").

21. The Debtor offered to pay the missed interest payment in full so as to restore PNC to its prior economic condition, but PNC refused to accept the payment. Further, PNC stopped providing funding for certain construction costs, and the Debtor had to cover these costs in order to meet the provisions of certain tenant leases.

22. With no other recourse, the Debtor was forced to enter into a short-term forbearance agreement with PNC. Meanwhile, PNC consistently represented that if the short-term forbearance conditions were met, PNC would engage in good faith negotiations regarding a longer term restructuring. The Debtor met all conditions of the forbearance. But at its

expiration, PNC still refused to engage in negotiations regarding a longer term restructuring of the Obligations. In fact, PNC insisted on full payment, knowing full well that the Debtor could no longer use the rents to make such payment.

23. As a result of the Rent Letter and the Turnover Letters, PNC has been in direct receipt of the tenants' monthly rental payments, which has caused disruption. Since PNC took over the collection of rents, Deptford's management has had to rely on PNC to pay the Deptford bills. On multiple occasions, PNC has disputed the need for services, and Deptford's management has struggled to get PNC to pay certain bills. If this continues, PNC could cause significant harm to Deptford and its tenants.

24. Further, PNC refused to pay the broker fee on a new lease. Although Deptford's occupancy is high, tenants can lose business and have to be replaced, at any time. Retail space that remains empty can hurt surrounding businesses, in a domino effect. PNC's actions jeopardize Deptford's relationship with its brokers and thus its ability to maintain favorable occupancy rates. The Debtor also is concerned that PNC will refuse to fund tenant improvements that often are required to accommodate a new tenant's business.

25. Over the past months, while PNC has controlled the rents, the Property has declined in value. Continued disruption in the operation and maintenance - including the lease up - of the Property will cause Deptford's tenants to continue to suffer and will cause further deterioration in the value of the Property. Further, PNC has refused to apply the rents to service the various debt obligations in violation of the Loan Documents. Thus, the Debtor seeks relief through the filing of this chapter 11 case to, among other things, use Cash Collateral to provide for the payment of the costs and expenses necessary for the continued operation and maintenance of the Property.

## II. SUMMARY OF FIRST DAY MOTIONS AND APPLICATIONS[1]

### A. Administrative Motions

26. The Debtor has filed certain administrative motions in its First-Day Motions and Applications, including the following:

- Motion for Approval of Notice Procedures;

- Motion for Establishment of Procedures For Monthly Compensation and Reimbursement of Expenses of Professionals

27. The Debtor seeks authority to implement these administrative motions, which are designed to minimize the administrative burdens on the Debtor, the Court, and all parties in conducting these proceedings. I believe that the relief requested in these motions is important for the Debtor's smooth transition into chapter 11.

### B. Motion for Authority to Continue Using Existing Cash Management System and Cash Management Procedures

28. The Debtor's ability to continue and maintain its existing Cash Management System and cash management procedures is essential to the efficient administration of its bankruptcy estate and is necessary to prevent inordinate disruption to the Debtor's business operations. Any disruption of the Cash Management System could have a severe and adverse impact on the Debtor's reorganization efforts and on the Debtor's day-to-day business operations.

29. As described above, SCP Management historically has handled the collection of rents and payment of expenses for the Debtor through this consolidated Cash Management System. The general requirement for a debtor to open separate post-petition accounts for

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Motion or First-Day Application.

separate purposes—such as cash collateral and deposit accounts—should not apply in this case. Given that the Debtor does not have any employees of its own, the Debtor lacks the personnel to manage its own financials. It would be costly and impractical for the Debtor to retain the personnel necessary to perform and oversee such tasks when SCP Management already possesses the necessary familiarity and ability to manage these aspects of the Debtor's operations. Any attempt to open new bank accounts would require a significant transition period, cause additional expenses to be incurred, and significantly disrupt the Debtor's business operations and reorganization efforts.

30. The internal "sub-account" system will allow the Debtor and SCP Management to account accurately for all receipts, transfers and disbursements made with respect to Deptford. All such receipts, transfers and disbursements will be properly documented and accurate balances will be maintained. Thus, the flow of money into and out of the Debtor will remain transparent under the existing cash management procedures.

C. **Motion for Order (i) Determining that the Rents Generated From the Debtor's Property Constitute Cash Collateral, (ii) Authorizing the Debtor to Use Cash Collateral in the Ordinary Course of Business, (iii) if Necessary, Granting Alternative Relief, and (iv) Scheduling a Final Hearing**

31. The Debtor requires immediate use of the rents generated from Deptford. The rents in this instance consist of both the cash on hand, the rents collected by PNC, and any other money collected from tenants, wherever located. In the absence of the use of Cash Collateral, the continued operation of the Debtor's business, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtor and its estate would occur. There is an equity cushion in the Property that will diminish rapidly if the Property is not properly

maintained.[2] Consequently, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtor and will enhance the prospects for a successful reorganization of the Debtor under chapter 11 of the Bankruptcy Code.

32. The use of the rents during the pendency of this chapter 11 case to pay ongoing expenses for the maintenance and operation of the Property will only preserve or enhance the value of the Property and, as such, will provide adequate protection. Without the immediate ability to use Cash Collateral to provide for the continued operation, maintenance and lease up of the Property, the Debtor will lose tenants and not be able to procure new tenants, and the value of the Property will continue to decline. It is in the best interests of the Debtor's estate and all creditors to allow the Property to continue to operate and to terminate the mismanagement by PNC. Accordingly, the Debtor requests that the Court authorize the Debtor's use of Cash Collateral during the pendency of this chapter 11 case in the manner and for the purposes set forth in the Cash Collateral Motion and in the Cash Management Motion.

33. To the extent this Court determines that the rents are not Cash Collateral, the Debtor will be without the means to, and thus unable to, provide for the payment of the costs and expenses necessary for the continued operation, maintenance and lease up of the Property. The equity cushion in the Property is diminishing and will continue to diminish rapidly if the Property is not properly maintained during the pendency of this chapter 11 case. Accordingly, if PNC continues to receive the rents during this chapter 11 case, it must use such rents, along with any rents it collected prior to the Petition Date, to provide for the payment of all costs and expenses necessary for the operation and maintenance of the Property and the Debtor's business

---

[2] The value of the Property has in fact decreased since PNC assumed collection of the rents from tenants at Deptford.

operations, including costs associated with tenant improvements and lease commissions, payment of the monthly management fee and payroll allocation reimbursement to SCP Management, and monthly payments due under the Loan Documents.[3] Given PNC's wrongful conduct to date, there is no reason to expect such cooperative action on its part. In addition, PNC should not be permitted to disturb the lease agreements with the current tenants at Deptford, and should cooperate with the Debtor with respect to any and all future leases.[4] Such relief is necessary to, among other things, preserve the value of the Property and ensure a successful reorganization in this chapter 11 case.

### D. Application for an Order Authorizing Employment and Retention of Andre M. Toffel, P.C.

34. The Debtor seeks to employ Andre M. Toffel, P.C. ("Toffel") as its bankruptcy counsel. The Debtor has selected Toffel as its attorneys because of the firm's extensive experience and knowledge, and its recognized expertise in the field of debtors' protections, creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code, as well as in other areas of law related directly or indirectly to this bankruptcy case. Toffel has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of the Debtor's bankruptcy case. The Debtor believes that Toffel is both well qualified and uniquely able to represent it in this case and in other matters in a most efficient and timely manner.

---

[3] Section 362(d)(3) of the Bankruptcy Code authorizes the use of rents towards monthly debt service payments without the consent of the secured lender and without the need for court approval.

[4] This appropriate use of the rents can only be assured by requiring that all rents be turned over to SCP Management. Alternatively, if SCP Management is denied the rents, any balance remaining after such payments are made each month should be placed in escrow.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 1st day of April, 2010, at Birmingham, Alabama.

By: _____
Ronald R. Day
Chief Financial Officer, AIG Baker Shopping
Center Properties, L.L.C