# Exhibit A

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT (together with the Exhibits, as any of the foregoing may be from time to time amended, modified, extended, renewed, refinanced and/or supplemented, referred to as this "Agreement") is made as of the 14th day of November, 2006, by and among **AIG BAKER DEPTFORD, L.L.C.**, a Delaware limited liability company, (the "Borrower"), **PNC BANK, NATIONAL ASSOCIATION**, as Lead Arranger, Administrative Agent and Bookrunner (hereinafter, together with its successors and assigns whether by assignment, merger or otherwise, referred to as the "Agent") for the Banks (as hereinafter defined), and the financial institutions party hereto as of the date hereof and each and every financial institution which may from time to time become a party hereto (hereinafter, together with the successors and assigns of each, referred to individually as a "Bank" and collectively as the "Banks").

### WITNESSETH:

WHEREAS, the Borrower has requested that the Banks provide a construction loan to the Borrower in an aggregate principal amount not to exceed $38,867,862.00 (each initially capitalized term used in these recitals having the meaning ascribed to it in Article 1 [Definitions] of this Agreement);

WHEREAS, the Loan shall be used to finance the costs of acquiring the Land and constructing and equipping the Improvements; and

WHEREAS, the Banks are willing to provide the Loan upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, the parties hereto, in consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, covenant and agree as follows:

### 1. DEFINITIONS

1.1 Definitions.

In addition to words and terms defined elsewhere in this Agreement, the following terms shall have the following meanings, respectively, unless the context hereof clearly requires otherwise:

"Action Request" shall have the meaning assigned to that term in Section 11.14 [Agent's or Bank's Consent] hereof.

"Affiliate" as to any Person shall mean any other Person (i) which directly or indirectly controls, is controlled by, or is under common control with such Person, (ii) which beneficially owns or holds 5% or more of any class of the voting stock (or in the case of a Person which is not a corporation, more than 5% of the equity interest) of such Person, or (iii) 5% or more of the voting stock (or in the case of a Person which is not a corporation, 5% or more of the equity

838393 10

interest) of which is beneficially owned or held, directly or indirectly, by such Person. "Control" as used in this definition, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case may be.

"Agent" shall have the meaning assigned and ascribed to such term as set forth in the preamble of this Agreement.

"Agent's Consultants" shall have the meaning assigned to that term in Section 9.5 [Reimbursement and Indemnification of Agent by the Borrower] hereof.

"Agent's Fee" shall have the meaning assigned to that term in Section 9.14 [Agent's Fee] hereof.

"Agent's Letter" shall have the meaning assigned to that term in Section 9.14 [Agent's Fee] hereof.

"Agreement" shall have the meaning assigned and ascribed to such term as set forth in the preamble of this Agreement.

"Anchor Leases" shall mean a collective reference to the Sam's Club Lease and the Wal-Mart Lease.

"Anchor Tenants" shall mean a collective reference to Wal-Mart and Sam's Club.

"Anchor Tenants SNDAs" shall mean a collective reference to the Wal-Mart SNDA and the Sam's Club SNDA.

"Annual Statements" shall have the meaning assigned to that term in Section 8.31 [Financial Statements] hereof.

"Anti-Terrorism Laws" shall mean any Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Law administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Laws may from time to time be amended, renewed, extended, or replaced).

"Appraisal" shall mean a written appraisal prepared by an independent appraiser engaged by Agent on behalf of the Banks at the Borrower's sole cost and expense, prepared in compliance with all applicable regulatory requirements, being also subject to the Agent's customary independent appraisal requirements.

"Appraised Value AS-IS" shall mean, as of any date of determination the "AS-IS" dollar value of the Project, as determined by an Appraisal of the Project.

"Appraised Value Stabilized" shall mean, as of any date of determination the "Stabilized" dollar value of the Project, as determined by an Appraisal of the Project.

"Architect" shall mean Ignarri - Lummis Architects, L.L.P. or such other architect as may be expressly consented to or approved by the Agent in writing prior to Borrower's engagement of such architect.

"Architect's Agreement" shall mean that certain Abbreviated Standard From of Agreement Between Owner and Architect AIA Document B151-1997, dated July 21, 2005, entered into between Borrower and the Architect, and all exhibits and attachments thereto, as the same may be amended from time to time in writing by the parties thereto with the consent of the Agent in accordance with the terms of this Agreement.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement by and among a Purchasing Bank, a Transferor Bank and the Agent, on behalf of the Banks, substantially in the form of Exhibit 1.1(A) attached hereto and made a part hereof.

"Assignment of Construction and Development Documents" shall mean that certain Assignment of Construction and Development Documents of even date herewith from the Borrower to the Agent on behalf of the Banks, as the same may be amended, replaced or supplemented from time to time in writing by the Borrower and the Agent.

"Assignment of Development Agreement" shall mean that certain Assignment of Development Agreement of even date herewith from the Borrower to the Agent on behalf of the Banks, as the same may be amended, replaced or supplemented from time to time in writing by the Borrower and the Agent.

"Assignment of Leases" shall mean that certain Assignment of Rents, Leases and Profits of even date herewith from the Borrower to the Agent on behalf of the Banks, as the same may be amended, replaced or supplemented from time to time in writing by the Borrower and the Agent.

"Assignment of Management Agreement" shall mean that certain Assignment and Subordination of Management Agreement from the Borrower to the Agent on behalf of the Banks, as the same may be amended, replaced or supplemented from time to time in writing by the Borrower and the Agent, which shall be executed at the time the a management agreement for the Project is executed, which Assignment of Management Agreement shall be substantially in the form of Exhibit 1.1 (AA) attached hereto and made a part hereof.

"Authorized Officer" shall mean those Persons designated by written notice to the Agent from the Borrower authorized to execute notices, reports and other documents on behalf of the Borrower. The Borrower may amend such list of Persons from time to time by giving written notice of such amendment to the Agent.

"Bank Reply Period" shall have the meaning assigned to that term in Section 9.18 [Consents and Approvals] hereof.

3

838393 10

Case 10-02059-TBB11    Doc 21-2    Filed 04/05/10    Entered 04/05/10 21:01:38    Desc
Exhibit A to Affidavit (Part 1)    Page 4 of 15

"Banks" shall mean the financial institutions named on **Schedule 1.1(B)** attached hereto and made a part hereof and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a Bank.

"Base Rate" shall mean, the greater of (i) the interest rate per annum announced from time to time by the Agent at its Principal Office as its then prime rate, which rate may not be the lowest rate then being charged commercial borrowers by the Agent, or (ii) the Federal Funds Effective Rate plus 3/4% per annum.

"Base Rate Option" shall have the meaning assigned to that term in subsection 3.1(a) [Base Rate Option] hereof.

"Benefit Arrangement" shall mean at any time an "employee benefit plan," within the meaning of Section 3(3) of ERISA, which is neither a Pension Plan nor a Multiemployer Plan and which is maintained, sponsored or otherwise contributed to by any member of the ERISA Group.

"Blocked Person" shall have the meaning assigned to such term in Section 8.32(b) [Anti-Terrorism Laws] hereof.

"Borrower" shall have the meaning assigned and ascribed to such term as set forth in the preamble of this Agreement.

"Borrowing Date" shall mean the date of the making of an advance of the Loan or the renewal or conversion thereof at or to the same or a different Interest Rate Option, which date (i) shall be a Business Day and (ii) in the case of the making of an advance of the Loan, shall be the date on which each of the Banks is required to wire transfer to the Agent its ratable share of such advance pursuant to subsection 6.1(b) [Procedures] of this Agreement.

"Borrowing Tranche" shall mean specified portions of the Loan outstanding as follows: (i) any portion of the Loan to which a LIBOR Option applies which becomes subject to the same Interest Rate Option by reason of the selection, conversion to or renewal thereof by the Borrower and which have the same LIBOR Interest Period shall constitute one Borrowing Tranche, and (ii) all portions of the Loan to which the Base Rate Option applies shall constitute one Borrowing Tranche.

"Business Day" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required to be closed for business in Pittsburgh, Pennsylvania and, if the applicable Business Day relates to any Borrowing Tranche to which the LIBOR Option applies, such day must also be a day on which dealings are carried on in the London interbank market.

"Category" shall have the meaning assigned to that term in Section 4.19 [Changes in Construction and Development Documents] hereof.

4

"Certificate of Occupancy" shall mean an unconditional (or with conditions acceptable to the Agent) certificate of occupancy, together with any and all other Governmental Approvals required for use and occupancy of all Improvements.

"Closing Date" shall mean the date of this Agreement.

"Closing Fee" shall have the meaning assigned to that term in the Agent's Letter.

"Collateral" shall mean the real estate encumbered by the Mortgage and all other security pledged pursuant to this Agreement and the Collateral Documents including, without limitation any personal or real property.

"Collateral Documents" shall mean the Mortgage, the Assignment of Leases, the Assignment of Construction and Development Documents, the Assignment of Development Agreement, the Assignment of Management Agreement, the Financing Statements and any other documents securing the Loan, as the same may from time to time be amended, renewed, extended or replaced.

"Commitment" shall mean as to any Bank the amount set forth opposite its name on **Schedule 1.1(C)** attached hereto and made a part hereof or such other amount pursuant to Section 11.11 [Successors and Assigns], and "Commitments" shall mean the aggregate commitments of all of the Banks. At the commencement of the Extension Period, if any, the "Commitments" shall automatically be reduced to the outstanding principal balance as of the first day of the Extension Period plus the remaining availability under the Loan, if any, and the Commitment of each Bank shall be reduced proportionately so as to retain the same Commitment Percentage.

"Commitment Percentage" shall mean the proportion that a Bank's Commitment bears to the Commitments of all of the Banks, being, at the time of execution hereof, the percentages referenced on **Schedule 1.1(C)** attached hereto and made a part hereof.

"Completion Date" shall mean the date on which Completion of Construction occurs, which date shall in no event be later than the Required Completion Date.

"Completion of Construction" shall mean that the conditions of Section 6.6(b) [Retainage Disbursements] hereof are satisfied.

"Conditions for Extension" shall mean the provision by the Borrower to the Agent of evidence in form and substance satisfactory to the Agent (including, without limitation, certifications from the Borrower and/or the Guarantor) for the benefit of the Banks of Borrower's compliance with the following:

    (a)    no Potential Default or Event of Default has occurred;

    (b)    the Guarantor is in compliance with the financial covenant set forth in Section 4.41 [Financial Covenants] hereof as evidenced to the Agent's satisfaction;

Case 10-02059-TBB11    Doc 21-2    Filed 04/05/10    Entered 04/05/10 21:01:38    Desc
Exhibit A to Affidavit (Part 1)    Page 6 of 15

(c) the outstanding principal amount of the Loan does not exceed eighty percent (80%) of the Appraised Value AS-IS; as determined by the Agent pursuant to an updated appraisal which shall have been delivered to, and approved by, the Agent (from an appraiser satisfactory to the Agent), which appraisal shall be delivered to the Agent on or about thirty-five (35) months from the date hereof;

(d) the Debt Service Coverage Ratio as calculated immediately prior to the applicable Extension Period, is not less than 1.20 to 1.0;

(e) INTENTIONALLY OMITTED;

(f) the lien-free Completion of Construction has occurred (which evidence shall include, without limitation, lien and title searches);

(g) a Certificate of Occupancy or Temporary Certificate of Occupancy or, if neither are available, a letter from Agent's Inspecting Architect which confirms that the Project has been substantially completed in accordance with the Plans;

(h) payment in good funds of the Extension Fee to the Agent for the benefit of the Banks has been made;

(i) if requested by the Bank, a flood certification confirming that the Project is not in a flood hazard area or, if such flood certification indicates that the Project is in a flood zone, evidence that the Borrower has obtained flood insurance required by the terms of the Loan Documents and shall have otherwise complied with all of the requirements of the Loan Documents with respect thereto;

(j) the Borrower shall have invested its required Equity Contribution in full into the Project; and

(k) the Agent has received an endorsement to its title insurance policy in form approved by the Agent insuring the priority of the lien of the Mortgage in the amount of all disbursements of the Loan and containing no exceptions other than Permitted Encumbrances.

Notwithstanding anything to the contrary contained herein, so long as the other Conditions for Extension are met, if a reduction in the then-outstanding principal amount of the Loan is necessary to satisfy the Debt Service Coverage Ratio requirement as described in subsection (d) above and/or to satisfy the loan to value ratio requirement of subsection (c) above, the Borrower may make a permanent, non-refundable principal payment (which may not be re-borrowed) in an amount that would satisfy the Debt Service Coverage Ratio and/or loan to value ratio requirement required herein, and thereby extend the term of the Loan for an additional twelve (12) months as provided herein.

"Conditions for Initial Payment Guaranty Principal Reduction" shall have the defined meaning as set forth in the Payment and Completion Guaranty.

6

838393 10

"Construction and Development Documents" shall mean the Construction Contracts, the Architect's Agreement, the Engineer's Agreement, the Development Agreement, the ECR, the Plans, the Governmental Approvals, and all other instruments, documents and rights relating to the design, construction and development of the Improvements, as set forth on **Schedule 1.1 (CON)** attached hereto and made a part hereof.

"Construction Contracts" shall mean the General Construction Contracts and the Major Subcontracts.

"Contamination" shall mean the presence or release or threat of release of Regulated Substances in, on, under or migrating to or from the Project, which pursuant to Environmental Laws requires notification or reporting to an Official Body, which constitutes a violation of Environmental Laws or Environmental Permits, or which pursuant to Environmental Laws requires the performance of Remedial Action.

"Contractor" shall mean a collective reference to the Vertical Improvements General Contractor and the Site Work General Contractor, or such other substitute, replacement or additional contractors as may be approved by the Agent in writing prior to the Borrower's engagement of such other substitute, replacement or additional contractor. Such approval shall not be unreasonably withheld, delayed or conditioned.

"Contractor's Consent" shall mean the form of Contractor's Consent attached hereto as **Exhibit 6.4 (A)**, or such other form as Agent may reasonably approve, which Contractor's Consent shall be executed by the Vertical Improvements General Contractor, the Site Work General Contactor and all Major Subcontractors. Such approval shall not be unreasonably withheld, delayed or conditioned.

"Debt Service" shall mean the higher of the following (i) the sum of all principal and interest expense anticipated to be paid under the Loan over a twelve (12) month period, as calculated by the Agent or (ii) the sum of all principal and interest payments that would be payable over a twelve (12) month period with respect to a loan in the aggregate amount of the Commitments based upon a thirty (30) year mortgage-style amortization schedule, assuming an interest rate per annum equal to the higher of (a) five and one-half (5.5%) percent or (b) one and one-half (1.5%) percent above the "weekly average yield" on United States Treasury Securities adjusted to a constant maturity of ten (10) years, as published in the Federal Reserve Statistical Release ("Release") seven (7) Business Days prior to the date of determination. If the Release is no longer published, a reasonable equivalent substitute therefor as may be selected by the Agent for the benefit of the Banks in its discretion shall be utilized, and further provided that if the Release is not published seven (7) Business Days prior to the date of determination, then the Release as published on the most recent date prior thereto shall be utilized.

"Debt Service Coverage Ratio" shall mean, as of any date of determination thereof, the ratio of Net Operating Income (based on Leases approved by the Agent) to Debt Service for the same period, all on a pro-forma annualized basis.

7

838393 10

Case 10-02059-TBB11   Doc 21-2   Filed 04/05/10   Entered 04/05/10 21:01:38   Desc
Exhibit A to Affidavit (Part 1)   Page 8 of 15

"Default Rate" shall mean interest at a rate per annum that is four percent (4%) in excess of the rate otherwise in effect under this Agreement.

"Delinquency Amount" shall have the meaning assigned to such term in subsection 2.6(a) [Effect of a Delinquent Bank's Failure to Make an Advance of Loan Proceeds] of this Agreement.

"Delinquency Notice" shall have the meaning assigned to such term in subsection 2.6(a) [Effect of a Delinquent Bank's Failure to Make an Advance of Loan Proceeds] of this Agreement.

"Delinquent Bank" and "Delinquent Banks" shall mean any Bank that has failed to make any Required Advance or other payment due from such Bank to the Agent in accordance with the provisions of this Agreement.

"Delinquent Rate" shall mean (i) the Federal Funds Effective Rate for the first three (3) days after the date such interest shall begin to accrue, and (ii) the applicable interest rate in respect of such portion of the Loan after the end of such three (3) day period.

"Development Agreement" shall mean a reference to that certain Development Agreement dated November 3, 2006 executed by and among the Borrower, Wal-Mart and Sam's Club, together with all exhibits and schedules thereto, as the same may be amended from time to time in writing by the parties thereto to the extent permitted under the terms of the Loan Documents.

"Development Budget" shall mean the Development Budget attached to this Agreement as **Exhibit 1.1(D)**, as the same may be amended from time to time in writing by the Borrower and approved by the Agent in accordance with Section 6.3 [Cost Information] hereof. Such approval shall not be unreasonably withheld, delayed or conditioned..

"Disbursement Request" shall mean any request for proceeds of the Loan in accordance with Article 6 [Closing and Disbursement Matters] hereof.

"Dollar," "Dollars", "U.S. Dollar" and the symbol "$" shall mean lawful money of the United States of America.

"ECR" shall mean that certain Easements with Covenants and Restrictions Affecting Land dated November 3, 2006 executed by and among Wal-Mart, Sam's Club and the Borrower, together with all exhibits and schedules thereto, as the same may be amended from time to time in writing by the parties thereto to the extent permitted under the terms of the Loan Documents.

"Electing Bank" shall have the meaning assigned and ascribed to such term as set forth in subsection 2.6(a) [Effect of a Delinquent Bank's Failure to Make an Advance of Loan Proceeds] of this Agreement.

"Election Notice" shall have the meaning assigned and ascribed to such term as set forth in subsection 2.6(a) [Effect of a Delinquent Bank's Failure to Make an Advance of Loan Proceeds] of this Agreement.

8

"Election Period" shall have the meaning assigned and ascribed to such term as set forth in subsection 2.6(a) [Effect of a Delinquent Bank's Failure to Make an Advance of Loan Proceeds] of this Agreement.

"Engineer" shall mean Bohler Engineering P.C., or such other substitute, replacement or additional engineer as may be approved by the Agent prior to the Borrower's engagement of such other substitute, replacement or additional engineer. Such approval shall not be unreasonably withheld, delayed or conditioned.

"Engineer's Agreement" shall mean that Proposal and Agreement for Professional Services dated September 25, 2003 between the Engineer and the Borrower relating to the furnishing of civil engineering services by Engineer with respect to the Project, and all exhibits and attachments thereto, as the same may be amended from time to time in writing by the parties thereto with the consent of the Agent in accordance with the provisions of this Agreement.

"Environmental Claim" shall mean any (1) notice of non-compliance or violation, citation or written request for information relating in any way to any Environmental Law, Environmental Permit, Contamination or Regulated Substances; (2) civil, criminal, administrative or regulatory investigation instituted by an Official Body relating in any way to any Environmental Law, Environmental Permit, Contamination or Regulated Substance; (3) administrative, regulatory or judicial actions, suit, claim or proceeding instituted by any Person or Official Body or any written notice of liability or potential liability from any Person or Official Body, in either instance, setting forth allegations relating to or setting forth a cause of action for personal injury (including but not limited to death), property damage, natural resource damage, contribution or indemnity for the costs associated with the performance of Remedial Actions, liens or encumbrances attached to, recorded or levied against property for the costs associated with the performance of Remedial Actions and costs to remove any such liens or encumbrances, civil or administrative penalties, criminal fines or penalties, or declaratory or equitable relief arising under any Environmental Law; or (4) action, suit, claim or proceeding instituted by any Person or Official Body at law or in equity setting forth allegations relating to or a cause of action for personal injury (including but not limited to death), property damage, direct recovery or contribution or indemnity for the costs associated with the performance of Remedial Actions (for the purposes of this subpart (4) only, Remedial Actions shall include such actions with respect to Unregulated Dangerous Substances) or direct recovery or contribution or indemnity for the costs associated with demolition, redesign, reconstruction, rebuilding or repair of any improvements.

"Environmental Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement of even date herewith from the Loan Parties, on a joint and several basis, to the Agent on behalf of the Banks, as the same may be amended, replaced or supplemented from time to time in writing by the parties thereto with the prior written consent of the Agent and the Required Banks, or, if required by Section 11.1 [Modifications, Amendments or Waivers] hereof, all of the Banks.

"Environmental Insurance Policy" shall mean that certain Pollution and Remediation Legal Liability Policy in the face amount of $10,000,000 dated February 17, 2006 issued by Greenwich Insurance Company in favor of Borrower; said Environmental Insurance Policy has

9

been endorsed so as to name the Agent (on behalf of the Banks) as an additional insured thereunder.

"Environmental Laws" shall mean the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. § § 300f-300j, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § § 136 to 136y, the Atomic Energy Act, 42 U.S.C. § 2011 et seq., each as amended, and any regulations promulgated thereunder or any equivalent state or local law or statute, as amended, and any regulations promulgated thereunder, and all other applicable federal, state, local, tribal, territorial and foreign laws, (including common law), constitutions, statutes, treaties, regulations, rules, ordinances and codes issued by an Official Body, together with any standards, prohibitions, limitations or the like recognized in the applicable industry, pertaining or relating to: (i) pollution or pollution control; (ii) protection of human health from exposure to Regulated Substances; (iii) protection of the environment and/or natural resources; (iv) the presence, use, management, generation, manufacture, processing, extraction, refining, treatment, recycling, reclamation, labeling, sale, transport, collection, distribution, storage, disposal or release or threat of release of Regulated Substances; (v) the presence of Contamination; (vi) the protection of endangered or threatened species; and (vii) the protection of Environmentally Sensitive Areas.

"Environmental Orders" shall mean all decrees, orders, directives, judgments, opinions, rulings, writs, injunctions, settlement agreements or consent orders issued by or entered into with an Official Body relating or pertaining to Contamination, Environmental Laws, Environmental Permits, Regulated Substances or Remedial Actions.

"Environmental Permits" shall mean all permits, licenses, bonds, consents, waivers, exemptions, registrations, identification numbers, approvals or authorizations required under Environmental Laws to own, occupy or maintain the Project or which otherwise are required for the operations and business activities of the Borrower.

"Environmental Report" shall mean those certain reports set forth on Exhibit 1.1(E) attached hereto and made a part hereof, or any other written report of the review and inspection of the Project prepared by an environmental consultant acceptable to Agent and engaged by Borrower (or by Agent pursuant to subsection 7.1(c) [Environmental Reports] hereof) at Borrower's sole cost and expense, together with a reliance letter satisfactory to Agent stating that Agent and the Banks may rely on such report in making the Loan, in all cases together with all annexes, schedules, exhibits and attachments thereto.

"Environmentally Sensitive Area" shall mean (i) any wetland as defined by applicable Environmental Laws; (ii) any area designated as a coastal zone pursuant to applicable Laws, including Environmental Laws; (iii) any area of historic, archeological or paleontologic significance or scenic area as defined or designated by applicable Laws, including Environmental Laws; (iv) habitats of endangered species or threatened species as designated by applicable Laws,

10

838393 10

including Environmental Laws; or (v) a floodplain or other flood hazard area as defined pursuant to any applicable Laws.

"Equity Contribution" shall mean the Borrower's contribution of $4,320,000 toward the total costs of the Project based on the information set forth on the Development Budget, as well as all other monies to be invested by the Borrower into the Project as set forth herein. It is expressly understood and agreed that the required Equity Contribution of the Borrower shall include all monies necessary to complete the site improvements at the Project, regardless of whether Wal-Mart and/or Sam's Club pays, or fails to pay, any of the Site Reimbursement Monies.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"ERISA Group" shall mean, at any time, the Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with the Borrower, are treated as a single employer under Section 414 of the Internal Revenue Code.

"Event of Default" or "Events of Default" shall have the meaning assigned to those terms in Section 10.1 [Events of Default] hereof.

"Executive Order No. 13224" shall mean Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Exhibits" shall mean any one or more of those schedules and exhibits attached hereto and made a part hereof.

"Expiration Date" shall mean the earlier of: (1) November 14, 2009, as the same may be extended pursuant to Section 2.4 [Extension Options] hereof; or (2) the date upon which the Loan is accelerated pursuant to this Agreement.

"Extension Fees" shall mean the amount that is equal to one fifth of one percent (.20%) of the amount of the Commitments at the commencement of each Extension Period.

"Extension Options" shall mean the First Extension Option and the Second Extension Option.

"Extension Period" shall have the meaning assigned to such term in Section 2.4 [Extension Options] hereof.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed, and rounded upward to the nearest 1/100 of one percent (1%)) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by

11

838393 10

Federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Fee Parcel" shall mean those certain lands and premises owned by the Borrower in fee simple and particularly described on Exhibit B of the Mortgage, and is designated as Lot 2.01, Block 1.01 on the Tax Map of the Township of Deptford, Gloucester County, New Jersey. The Fee Parcel is defined as "Parcel B" in the Mortgage. The Fee Parcel includes all of the Land, other than the Ground Lease Parcel.

"Financing Statements" shall mean the financing statements which the Agent on behalf of the Banks may from time to time require in order to perfect the security interest granted to the Agent, for the benefit of the Banks in and to the Collateral described in the Mortgage, the other Collateral Documents and this Agreement pursuant to the applicable Uniform Commercial Code.

"First Disbursement" shall mean the first disbursement of Loan proceeds, to be made upon the fulfillment of the conditions set forth in Article 6 [Closing and Disbursement Matters] hereof.

"First Extension Option" shall mean the first twelve (12) month Extension Option as set forth in Section 2.4 [Extension Options] hereof.

"First Extension Period" shall have the defined meaning as set forth in the Notes.

"Force Majeure Event" shall mean an act of God, strike, lockout, explosion, act of sabotage, riot, civil commotion, act of war, fire, other casualty or any other cause beyond the reasonable control of the Borrower which shall delay the progress of construction of the Improvements for a period of at least five (5) Business Days, provided that Borrower shall notify the Agent within five (5) Business Days following the commencement of the Force Majeure Event, and provided further that the Agent shall determine in its reasonable discretion that a Force Majeure Event has occurred. For the purposes of this definition of "Force Majeure Event", the following are expressly excluded as a Force Majeure Event: (i) a shortage of materials in connection with the completion of the Project, unless the same is Force Majeure under the Anchor Leases and (ii) a shortage of funds by the Borrower or any party to the Construction and Development Documents.

"GAAP" shall mean generally accepted accounting principles as are in effect from time to time, subject to the provisions of Section 1.3 [Accounting Principles] hereof, and applied on a consistent basis both as to classification of items and amounts.

"GE" shall mean General Electric Company, a New York corporation, its successors and assigns.

12

838393 10

"General Construction Contract" shall mean a collective reference to the Vertical Improvements General Construction Contract and the Site Work General Construction Contract.

"Governmental Approvals" shall mean all consents, licenses, permits and all other authorizations or approvals required by Official Bodies, including, without limitation, all agreements entered into with any Official Body, with respect to the development, construction, completion, use and occupancy of the Land and Improvements.

"Ground Lease" shall mean that certain Land Lease dated as of August 4, 2004 by and between GE and AIG Baker Shopping Center Properties, L.L.C, and all exhibits and attachments thereto, as the same may be amended from time to time in writing by the parties thereto with the consent of the Agent to the extent permitted under the terms of this Agreement. Such consent shall not be unreasonably withheld, delayed or conditioned. Pursuant to that certain Assignment and Assumption Agreement dated February 17, 2006, AIG Baker Shopping Center Properties, L.L.C. assigned all of its rights, title and interest in and to the Ground Lease to the Borrower.

"Ground Lease Parcel" shall mean those certain lands and premises owned by GE and leased by the Borrower pursuant to the Ground Lease, as more particularly described on Exhibit A to the Mortgage, and designated as Lot 2, Block 1.01 on the Tax Map of the Township of Deptford, Gloucester County, New Jersey. The Ground Lease Parcel is described as "Parcel A" in the Mortgage.

"Guarantor" shall mean AIG Baker Partnership, a Delaware general partnership.

"Guaranty" of any Person shall mean any obligation of such Person guaranteeing or in effect guaranteeing any liability or obligation of any other Person in any manner, whether directly or indirectly, including any agreement to indemnify or hold harmless any other Person, any performance bond or other suretyship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

"Historical Statements" shall have the meaning assigned to that term in Section 8.31 [Financial Statements] hereof.

"Impositions" shall mean all (i) real estate and personal property taxes and other taxes and assessments, water and sewer rates and charges and all other governmental charges and any interest or costs or penalties with respect thereto and charges for any easement or agreement maintained for the benefit of the Land and Improvements, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever which at any time may be assessed, levied or imposed upon the Land or the Improvements, or the rent or income received therefrom, or any use or occupancy thereof, and (ii) other taxes, assessments, fees and governmental charges levied, imposed or assessed upon or against the Loan Parties or any of its properties.

"Improvements" shall mean the construction and equipping of a 487,267± square foot shopping center to be known as "Deptford Landing" to be made in accordance with the Plans as

13

838393 10

Case 10-02059-TBB11    Doc 21-2    Filed 04/05/10    Entered 04/05/10 21:01:38    Desc
Exhibit A to Affidavit (Part 1)    Page 14 of 15

provided in this Agreement, and all site, highway, access, parking, utility, drainage and other improvements required in accordance with the Governmental Approvals.

"Indebtedness" shall mean, as to any Person at any time, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person, for, or in respect of: (i) borrowed money, (ii) amounts raised under or liabilities in respect of any note purchase or acceptance credit facility, (iii) reimbursement obligations (contingent or otherwise) under any letter of credit, currency swap agreement, interest rate swap, cap, collar or floor agreement or other interest rate management device, (iv) any other transaction (including, without limitation forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements (but not including trade payables and accrued expenses incurred in the ordinary course of business which are not represented by a promissory note or other evidence of indebtedness and which are not more than thirty (30) days past due), or (v) any guaranty.

"Insolvency Proceedings" shall mean, with respect to any Person, (a) a case, an action or proceeding with respect to such Person (i) before any court or any other Official Body under any bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, or (ii) for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator-conservator (or similar official) of any such Person or otherwise relating to the liquidation, dissolution, winding-up or relief of such Person, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets of creditors, or other similar arrangement in respect of such Person's creditors generally or any substantial portion of its creditors undertaken under any Law.

"Inspecting Architect" shall mean Charles Schmidt, A.I.A., or such other Person or entity as the Agent may designate from time to time (a) to inspect the construction of the Improvements; (b) to approve the Plans, drawings, sketches, specifications, reports, modifications, change orders and the like; (c) to certify that the construction of the Improvements has been completed in accordance with the Plans; and (d) to perform other related services with respect thereto on behalf of the Banks. Such approval shall not be unreasonably withheld, delayed or conditioned.

"Interest Payment Date" shall mean each date specified for the payment of interest in Section 3.8 [Interest Payment Dates] hereof.

"Interest Rate Option" shall mean any LIBOR Option or the Base Rate Option.

"Interim Statements" shall have the meaning assigned and ascribed to such term as set forth in Section 8.31 [Financial Statements] hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

14

838393 10

Case 10-02059-TBB11    Doc 21-2    Filed 04/05/10    Entered 04/05/10 21:01:38    Desc
Exhibit A to Affidavit (Part 1)    Page 15 of 15